UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOHNATHAN WILSON, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | 3:20cv1567 (MPS) |
| | : | |
| CONNECTICUT DEPARTMENT OF | : | |
| CORRECTIONS, et al., | : | |
| Defendants. | : | |

## INITIAL REVIEW ORDER

The plaintiff, John Wilson, a sentenced inmate[1] currently in the custody of the

Connecticut Department of Correction ("DOC") at Garner Correctional Institution, filed this civil

rights complaint *pro se* and *in forma pauperis* under 42 U.S.C. § 1983 against the DOC,[2] former

Commissioner Rollin Cook, Acting Interim Commissioner Angel Quiros, Deputy Commissioner

Cheryl Cepelak, Director of Security Antonio Santiago, District Administrator William

Mulligan, Director of Classification David Maiga, Karen Martucci, Carl Robinson Correctional

Institution ("Carl Robinson") Warden Zelynette Caron, Northern Correctional Institution

("Northern") Warden Roger Bowles, Northern Counselor Supervisor Mangiafico, Carl Robinson

Lieutenant Oulette, Carl Robinson Intelligence Phone Monitor Ramirez, Disciplinary Hearing

Officer ("DHO") Lieutenant Grimaldi, Northern Correction Officer Leone, Northern Correction

---

[1]On June 16, 2016, Wilson was sentenced to seven years of incarceration. *Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012) (the Court may "take judicial notice of relevant matters of public record."). http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=266801.

[2]The court must dismiss any section 1983 claim against the DOC because the state, a state agency, or a division of a state agency is not a "person" subject to suit under 42 U.S.C. § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (state and state agencies not persons within meaning of 42 U.S.C. § 1983).

Officer LaPrey, Carl Robinson Correction Officer Canales, Northern Correction Officer Cieboter, and Correction Officer John Doe in their official and individual capacities. Compl. (ECF No. 1).

Wilson alleges violation of his First, Fifth, Fourteenth and Eighth Amendment rights under the United States Constitution. *Id.* at ¶ 1. He sues the defendants in their official and individual capacities for damages and declaratory and injunctive relief.[3] *Id.* at ¶¶ 47-53. He also requests a security lien to be placed upon the assets and/or properties of each defendant. *Id.* at ¶ 54.

## I.      STANDARD OF REVIEW

Pursuant to 28 U.S.C. § 1915A, the court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101-102 (2d Cir. 2010).

---

[3]  Wilson has not alleged any facts about the personal involvement in the alleged constitutional violations by Cook, Quiros, Cepelak, Santiago, Martucci, Bowles, and Mangiafico as required to state a plausible claim for damages under 42 U.S.C. § 1983. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation omitted) (The "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."). Accordingly, the Section 1983 claims for damages against these defendants will be dismissed. The Court will also dismiss the claims against Officer Cieboter.   The only allegation about him in the complaint is that he substituted as Wilson's advisor at the disciplinary hearing after Officer LaPrey, who had been appointed advisor and had allegedly failed adequately to investigate the matter, failed to show up at the hearing.   ECF No. 1 para. 36. Cieboter is not alleged to have done anything else. He did not violate any of the defendant's constitutional rights merely by substituting for someone else as an advisor at a hearing.

In recent years, the Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g., Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a pro se complaint, a pro se complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g., Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

## II.    ALLEGATIONS

On March 13, 2020, Warden Caron placed Carl Robinson under lock down due to COVID-19. (ECF No. 1 at ¶ 21). During this time, Warden Caron toured the facility and addressed questions from the inmates. *Id.* Wilson asked her if she could resolve the problem with laundry because the clothing was being returned dirtier than when it was sent to be laundered. *Id.* She responded that "the water is what was dirty." *Id.* He also asked her why inmates's visits had been cut off while officers were allowed to go home. *Id.* She responded that the officers had not broken the law. *Id.* Her other responses to concerns about unsanitary conditions of confinement in the 3B Unit of Carl Robinson (black mold, flooding in the bathroom, unclean floor, bunks, etc.) emphasized the divide between the inmates and correctional officers. *Id.* She promised bleach and supplies to clean the bunks and surrounding area. *Id.*

Thereafter, the inmates did not see her again and did not receive bleach or cleaning supplies; and the dorm was swept and mopped by inmates who had no interest in the hygiene of the dorm. *Id.* at ¶ 22. Wilson and other inmates asked correctional staff about their access to

bleach, why the dorm was filthy, and why the inmates in the dorm could not clean their own area themselves. *Id.* The correctional staff stated that they were under the impression the inmates had received cleaning agents. *Id.* However, no cleaning supplies were provided to the inmates. *Id.*

The hostility between the inmate population and the prison administration grew from the start of the lockdown on March 13, 2020 to April 1, 2020. *Id.* at ¶¶ 23, 24. Food trays were being left at the bottom of the stairs and open to the elements. *Id.* The dorm bathroom remained flooded, and the dorm was unclean. *Id.* Correctional officers contracted COVID-19 and were out "sick." *Id.*

On April 1, 2020, the animosity almost caused a riot in Dorm 3B. *Id.* at ¶ 24. A Code Eleven (for flagrant disobedience or a combative inmate) was called about an inmate getting a cup of water and not getting on top of his bunk quickly enough. *Id.* When the correctional staff rushed in, the inmates argued with the officers and explained that the inmate had done nothing wrong. *Id.* Wilson held the inmate back from "getting into it" with the officers. *Id.*

At 4:00 PM on April 1, all inmate in Dorms 4A, 4B, 3A, and 3B refused dinner. *Id.* at ¶ 25. Wilson drafted a small note about the issues that the inmates wanted to discuss about remedying the unsanitary conditions of confinement. *Id.* The note was brought to Lieutenant Oullette, who took picture of the note and then maintained his watch at the dorm. *Id.* Wilson kept the younger inmates from erupting into frenzied violence while they waited for the Warden to come to their dorm. *Id.*

At 4:30 PM, Warden Caron entered the dorm. *Id.* at ¶ 26. Wilson, who had agreed to speak on behalf of the other inmates, informed her of the inmates' frustrations with unsanitary living conditions and unfair treatment from correctional staff. *Id.* He noted that the dorm had

almost rioted and that the inmates had not received bleach or the ability to clean their bunks. *Id.*
Warden Caron responded that this was because the inmates drink the bleach.  She said she did
not know what to do because the pandemic was unprecedented. *Id.* After Wilson suggested that
an officer walk around with a spray bottle, Deputy Warden Kenny indicated that Wilson's
suggestion could be possible and he would look into it. *Id.* Other inmates asked about the black
mold around the windows and the flooded bathroom. *Id.*

Thereafter, the inmates were permitted to cook commissary food and had normal
movement on modified lockdown. *Id.* at ¶ 27. A correctional officer walked around with a spray
bottle of bleach so that inmates could clean their bunk areas. *Id.* On April 2, 2020, the inmates
ate their three meals and masks were handed out. *Id.* at ¶ 28.

On April 3, 2020, Wilson was called to the activities building where he was met by thirty
correctional officers with K-9s. *Id.* at ¶ 29. He received no response to his question about what
he had done and was patted down and placed in cuffs. *Id.* Lieutenant Oullette gave a head nod to
Officer John Doe, who then proceeded to open Wilson's medicine bag without his permission.
*Id.* Wilson was "physically assaulted" and forcibly moved from Carl Robinson to Northern by
order of Warden Caron and Director Maiga. *Id.*

Upon arrival at Northern, he was subjected to a "Three Point Strip Search," reclothed,
and placed in shackles and cuffs with a tether chain. *Id.* He was escorted to Unit One West, Cell
118. *Id.* at ¶ 30.

On Sunday, April 5, 2020, Wilson was told that he was on administrative detention,
although he had not yet received a disciplinary report. Later that day, he received the disciplinary
report, although it was dated April 4, 2020. *Id.* The disciplinary report was written by Correction

Officer Canales but the Investigating Officer was Lieutenant Oullette.[4] *Id.* at ¶ 31. The disciplinary report charged Wilson with orchestrating a hunger strike on April 1, 2020. *Id.* at ¶ 33. The evidence cited telephone calls listened to by Correction Officer Ramirez and camera footage. *Id.* The investigation by Correction Officer Leone into the disciplinary report took almost two months due to extensions. *Id.* at ¶ 34

During the investigation, Wilson was held at Northern, a Level 5 maximum security prison, although he was a Level 2 inmate, which is the lowest security level for an incarcerated inmate. *Id.* At Northern, Wilson was placed in an isolation cell that was seven by twelve feet with another Level 5 inmate. *Id.* He sought mental health treatment numerous times without success. *Id.*

On April 22, 2020, Wilson was appointed Officer LaPrey as an advisor. *Id.* at ¶ 35. On April 27, 2020, LaPrey claimed to have reviewed the camera footage, although he later stated that he had not checked it. *Id.*

After forty days in administrative detention, Wilson was found guilty by Investigator Leone and DHO Grimaldi, who said he was "not finding [Wilson] guilty of the facts, but rather of [Wilson's] standing in the inmate community." *Id.* at ¶ 36. Officer Cieboter came to the meeting rather than Wilson's appointed advisor LaPrey. *Id.*

On May 18, 2020, a hearing for Wilson's Administrative Segregation was held. *Id.* at ¶ 37. On May 26, 2020, Hearing Officer Tugie recommended against Wilson's placement in Administrative Segregation. *Id.* at ¶ 38. However, Director of Offender Classification and

---

[4]  Wilson asserts that this discrepancy was a violation of DOC Administrative Directives. *Id.*

Population Management Maiga decided to place Wilson in Administrative Segregation based on a letter he had received about Wilson from Warden Caron dated April 7, 2020. *Id.*

On July 14, 2020, Wilson's disciplinary guilty finding was overturned by District Administrator Nick Rodriguez. *Id.* at ¶ 39. Wilson had noted inconsistencies in his hearings for his disciplinary report and Administrative Segregation. *Id.* He also noted that he had missing property, including a religious item that was last seen at Carl Robinson. *Id.* at ¶ 40.

Wilson was housed at Northern until September 22, 2020. *Id.* at ¶ 41. Thereafter, he was transferred to Garner where he is still in administrative segregation despite the fact that the guilty finding on his disciplinary report was overturned. *Id.*

Wilson has severe mental health issues with a history of manic-depressive bipolar disorder, post-traumatic stress disorder, anti-social personality disorder, and anxiety disorder. *Id.* at ¶ 42. Although Wilson has not had an episode or crisis in years due to persistence and cognitive behavioral therapy, the atmosphere at Northern and administrative segregation can cause mental health deterioration. *Id.*

Wilson has used the Administrative Remedy grievance procedures available at Northern, and Deputy Director Mulligan has checked the box indicating that he has exhausted his administrative remedies. *Id.* at ¶ 43. However, he has attempted to gain further information through Freedom of Information requests without success, which leads Wilson to believe there is a cover-up of the misconduct at Carl Robinson. *Id.*

## III.   DISCUSSION

Wilson alleges violation of his First, Fifth, Eighth and Fourteenth Amendment rights based on the issuance of the disciplinary report, his transfer to Northern, and placement in the

Administrative Segregation Program. *Id.* at ¶ 45. Specifically, he asserts violation of his First and Fourteenth Amendment rights to free speech and right to petition the government for redress of grievances; violation of his Eighth and Fourteenth Amendment rights to religious freedom; violation of his Fifth and Fourteenth Amendment property rights; and violation of his Fourteenth Amendment procedural and substantive due process rights.[5] *Id.* at ¶ 1.

### A.    First Amendment Retaliation

Wilson's complaint alleges that he was deprived of his rights to free speech and to petition the government for redress of grievances. *See* ECF No. 1 at ¶ 1.

"Prisoners have a constitutional right to petition the government, and it is a violation of § 1983 for prison officials to retaliate against prisoners for the exercise of that right." *Lopes v. Westchester County,* No. 18-CV-8205 (KMK), 2020 WL 7029002, at *6 (S.D.N.Y. Nov. 30, 2020) (citing cases); *see also Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988) ("[P]risoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right."); *Ciaprazi v. Goord,* No. Civ. 9:02CV00915, 2005 WL 3531464, at *7 (N.D.N.Y. Dec. 22, 2005) ("[P]laintiff, who has lodged formal complaints of prison conditions and treatment of inmates, has engaged in protected activity."). To prevail on a First Amendment retaliation claim, a plaintiff must establish (1) that the speech or conduct at issue

---

[5]  Wilson's claims concerning violations of his freedom of speech and right to petition the government and religious exercise are governed by First Amendment rather than Fourteenth Amendment substantive due process standards. "[I]f a constitutional claim is covered by a specific constitutional provision ... the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." *United States v. Lanier,* 520 U.S. 259, 272 n.7 (1997); *see also Collins v. Putt,* 979 F.3d 128, 148–49 (2d Cir. 2020) ("Because Collins's asserted liberty interest is the right to free speech guaranteed by the First Amendment, his due process claim should be assessed according to the standards applicable to government regulation of speech.").

was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019); *Holland v. Goord*, 758 F.3d 215, 225 (2d Cir. 2014) (internal quotation marks omitted).

Protected speech or activity includes filing a lawsuit, an administrative complaint, or a prison grievance. *See Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015); *Booth v. Comm'r of Corr.*, No. 19-CV-100 (MPS), 2019 WL 919580, at *5 (D. Conn. Feb. 25, 2019). Some district courts within the Second Circuit have determined that verbal or oral complaints regarding the conduct of prison officials or conditions of confinement may constitute protected speech in the context of a First Amendment retaliation claim, although this issue remains unsettled. *See Cosby v. McDonald*, No. 3:20-CV-432 (MPS), 2020 WL 5026550, at *6 (D. Conn. Aug. 25, 2020); *Dehaney v. Chagnon*, No. 3:17-CV-00308 (JAM), 2017 WL 2661624, at *3 (D. Conn. June 20, 2017). This court has held that "[a] prisoner has a right under the First Amendment to complain about prison conditions, especially conditions that the prisoner believes endanger his health and safety." *Gómez v. Department of Corrections*, No. 3:20-CV-00958 (JAM), 2020 WL 6526108, at *3 (D. Conn. Nov. 4, 2020) (permitting plaintiff's claim that he was retaliated against for complaining about prison staff's failure to use personal protective equipment to safeguard against COVID-19 transmission).

"An adverse action is defined as 'retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Brandon*, 938 F.3d at 40 (quoting *Davis*, 320 F.3d at 353).

In order to allege causation, the inmate must state facts "suggesting that the protected

conduct was a substantial or motivating factor in the [defendant's] decision to take action against [him]." *Moore v. Peters*, 92 F. Supp. 3d 109, 121 (W.D.N.Y. 2015) (quoting *Burton v. Lynch*, 664 F. Supp. 2d 349, 367 (S.D.N.Y. 2009)). "Some of the facts often used to determine retaliatory motive may include (1) temporal proximity between the protected conduct and the alleged retaliatory act, (2) the prisoner's prior good disciplinary record, (3) a finding of not guilty at the disciplinary hearing, and (4) statements by the officials showing motivation." *Ramos v. Semple*, No. 3:18-CV-1459 (VAB), 2019 WL 2422875, at *2 (D. Conn. June 10, 2019).

Courts treat prisoner retaliation claims "with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012) (citation omitted). Consequently, the Second Circuit has required that prisoner retaliation claims "be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *Dolan*, 794 F.3d at 295 (internal quotations and citation omitted).

Wilson alleges that shortly after he wrote a note and voiced complaints about the prison conditions to Warden Caron, he was placed in cuffs, had his medicine bag searched by Correction Officer John Doe under Lieutenant Oulette's direction, transferred to a high-security prison where he was placed in administrative detention by order of Warden Caron and Director Maiga; was issued a disciplinary report written by Correction Officer Canales after investigation by Lieutenant Oulette with information from Correction Officer Ramirez, was subsequently found by Correction Officer Leone and Lieutenant Grimaldi guilty of the charges of

orchestrating a hunger strike, and was placed in Administrative Segregation by Director Maiga against the recommendation of Hearing Officer Tugie. *Id.* at ¶¶ 26, 29-33, 36, 38.

For purposes of initial review, the court concludes that Wilson has sufficiently stated a plausible claim of First Amendment retaliation due to protected conduct. The court will permit Wilson's First Amendment retaliation claim to proceed against Warden Caron, Correction Officer John Doe, Lieutenant Oulette, Correction Officer Canales, Correction Officer Leone, Correction Officer Ramirez, DHO Lieutenant Grimaldi, Correction Officer LaPrey, and Director Maiga in their individual capacities because they all allegedly played a role in the asserted acts of retaliation taken against Wilson.

### B.    First Amendment Free Exercise

Wilson alleges that his "religious rights" were violated when Correction Officer John Doe opened his medicine bag without his permission. (ECF No. 1 at ¶ 29).

The Free Exercise Clause requires that government officials respect, and avoid interference with, the religious beliefs and practices of the people. *Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005). In *Salahuddin*, the Second Circuit held that, to state a plausible free exercise claim, "[t]he prisoner must show at the threshold that the disputed conduct substantially burdens his sincerely held religious beliefs." 467 F.3d at 274–75. "A substantial burden exists where the [government] 'puts substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Forde v. Zickefoose*, 612 F. Supp. 2d 171, 177 (D. Conn. 2009) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996)). The court should consider "whether [the prisoner] sincerely holds a particular belief and whether the belief is religious in nature" without "evaluat[ing] the objective reasonableness of the prisoner's belief." *Ford v. McGinnis*, 352 F.3d

582, 590 (2d Cir. 2003) (internal quotation omitted). In *Holland v. Goord*, 758 F.3d 215, 220-21 (2d Cir. 2014), the Second Circuit suggested that the "substantial burden test" may no longer be reflect the law in light of the United States Supreme Court decision in *Employment Division v. Smith*, 494 U.S. 872 (1990). It remains unresolved in this circuit whether a prisoner must show that the disputed conduct substantially burdened his sincerely held religious beliefs, but district courts within this circuit continue to apply the "substantial burden test" when addressing free exercise claims. *Caves v. Payne*, No. 3:20-CV-15 (KAD), 2020 WL 1676916, at *7 (April 4, 2020) (citing cases and applying "substantial burden test" to inmate's free exercise claim).

Here, the complaint provides no information about Wilson's religion or his sincere beliefs and thus no basis to suggest a violation of the First Amendment's Free Exercise Clause. Accordingly, the court must dismiss Wilson's claim of violation of his rights under the Free Exercise Clause.

### C.    Eighth Amendment

Wilson's complaint raises Eighth Amendment concerns about the use of excessive force, unsanitary conditions, and lack of mental health care during his confinement. Wilson's claims challenging these conditions are governed by the Eighth rather than the Fourteenth Amendment because he is a sentenced prisoner rather than a pretrial detainee. *See Bell v. Wolfish,* 441 U.S. 520, 535 n.16 (1979); *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017); *Abernathy v. Comm'r of Correction*, No. 3:20-CV-628 (VAB), 2020 WL 5097566, at *2 (D. Conn. Aug. 28, 2020) (dismissing Fourteenth Amendment claim).

### 1.    Excessive Force

Wilson alleges that he was physically assaulted, although he was not resisting the

correctional staff's commands. (ECF No. 1 at ¶ 29).

The Eighth Amendment protects prisoners from "cruel and unusual punishments." U.S. CONST. amend. VIII. "Although not every malevolent touch by a prison guard gives rise to a federal cause of action, inmates have the right to be free from the unnecessary and wanton infliction of pain at the hands of prison officials." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) (internal quotations and citations omitted). In order to state an Eighth Amendment claim for the use of excessive force, an inmate must allege two elements: (1) a sufficiently serious use of force (the objective element) (2) that has been inflicted for malicious or sadistic reasons rather than in a good-faith effort to maintain or restore discipline (the subjective element). *See Harris v. Miller*, 818 F.3d 49, 63-64 (2d Cir. 2016) (*per curiam*). Officers are liable not only when they use excessive force themselves, but also when they fail to intervene to stop the excessive use of force by another officer when in a position to observe the conduct and with time to intervene. *See Sloley v. VanBramer*, 945 F.3d 30, 46-47 (2d Cir. 2019).

Here, Wilson's allegations do not describe any physical harm or even any facts about the alleged "physical assault" – what if anything prompted the assault, whether, how, and where on his body he was struck, who was involved, how much force was used, or whether there were any injuries at all.   Indeed, the sole statement in his complaint referring to the application of any force is that, when he arrived at the activities building on April 3, "I could be seen on incident camera footage calm and compliant, asking what did I do, being physically assaulted, forcibly moved from Carl Robinson … to Northern, per order by [Caron and Maiga]."   ECF No. 1 at para. 29.   There is no specification of who assaulted him or who was nearby when he was assaulted, and it not clear that the "assault" was distinct from his being "patted down and …

13

placed in … 'chubb cuffs'" or transferred to Northern.  *Id.*   While the Court must construe a pro

se complaint liberally, the conclusory reference to being "physically assaulted," without more, is

not enough to state a plausible claim for excessive force against any defendant.   This claim is

dismissed without prejudice.

### 2.    Conditions of Confinement

Although the Constitution does not require "comfortable" prison conditions, the Eight

Amendment imposes certain duties on prison officials to "ensure that inmates receive adequate

food, clothing, shelter and medical care," and that prison officials "take reasonable measures to

guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (internal

quotation marks and citations omitted). To state a claim for deliberate indifference to health or

safety under the Eighth Amendment, an inmate must demonstrate both an objective and a

subjective element.

To meet the objective element, an inmate must allege that he was incarcerated under

conditions that resulted in a "sufficiently serious" deprivation, such as the denial of "the minimal

civilized measure of life's necessities" or a "substantial risk of serious harm." *Id.* at 834 (internal

quotation marks and citations omitted). To meet the subjective element, an inmate must allege

that the defendant prison officials possessed culpable intent—that is, the officials must have

known that the inmate faced a substantial risk to his health or safety and disregarded that risk by

failing to take corrective action. *See id.* at 834, 837. Thus, an allegation of merely negligent

conduct is insufficient. *Id.* at 835. Rather, the subjective element requires that a plaintiff allege

that prison officials acted with "a mental state equivalent to subjective recklessness, as the term

is used in criminal law." *Salahuddin,* 467 F.3d at 280. When evaluating a claim for deliberate

indifference to inmate safety, a court considers "the facts and circumstances of which the official was aware at the time he acted or failed to act." *Hartry v. Cty. of Suffolk*, 755 F. Supp. 2d 422, 436 (E.D.N.Y. 2010) (internal quotation marks and citation omitted).

Under the Eighth Amendment, inmates have a right to sanitary living conditions and the necessary materials to maintain adequate personal hygiene. *See Walker v. Schult,* 717 F.3d 119, 127 (2d Cir. 2013) (citing cases for the proposition that "the failure to provide prisoners with toiletries and other hygienic materials may rise to the level of a constitutional violation"). Unsanitary conditions have satisfied the objective element where "the area in front of a prisoner's cell is filled with human feces, urine, and sewage water, … a prisoner's cell is fetid and reeking from the stench of the bodily waste from the previous occupants, … a prisoner's cell floor has urine and feces splattered on the floor." *McFadden v. Noeth*, 827 F. App'x 20, 2020 WL 5415469, at *6 (2d Cir. 2020) (summary order) (citations and quotations omitted). The Second Circuit has rejected "any bright-line durational requirement for a viable unsanitary-conditions claim[,]" and instructed that a claim based on exposure to unsanitary conditions "depends on both the duration and severity of the exposure." *See Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015) (reversing district court's dismissal for failure to state an Eighth Amendment conditions of confinement claim where inmate plaintiff alleged that while kept naked in a strip cell, he was exposed to human waste for several days). As the Second Circuit explained:

> Where, for example, an exposure to human waste lasts merely ten minutes, but that exposure takes the form of working in a well while facing "a shower of human excrement without protective clothing and equipment," a jury may find an Eighth Amendment violation. *See Fruit v. Norris,* 905 F.2d 1147, 1151 (8th Cir.1990). Spending three days in that well was not required to state a claim. Likewise, a less severe exposure may be constitutionally permissible if rectified in short order but may become cruel and unusual with the prolonged passage of time. *See McCord [v. Maggio],* 927 F.2d [844,] 846–47

[(2d Cir. 1991)](holding that occasional sewage backup onto cell floor on which inmate slept over two-year period, among other conditions, violated Eighth Amendment).

*Id.*

Here, Wilson's allegations suggest that inmates could not clean their cells despite the presence of unsanitary conditions because they did not receive any cleaning materials during the lock-down, that the bathrooms remained flooded, and that the inmates' clothing returned dirty from the laundry. *Id.* In light of the fact that these alleged unsanitary conditions occurred during a COVID-19 lock-down, Wilson's claims suggest that the inmates had a heightened need to have the cleaning materials to disinfect their environment, a sanitary working bathroom, and laundered clothing. Accordingly, at this initial review stage, the court will allow this claim to proceed against Warden Caron, who heard the complaints of unsanitary conditions at Carl Robinson but allegedly failed to take steps to remedy the situation.

### 3.   Meal Service

Wilson alleges that his meals were exposed to snow and rain. *Id.* at ¶¶ 23, 26.

"[P]risoners are entitled to "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well being of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (citation omitted). A key consideration is whether the provision of food ultimately poses an "imminent danger to the inmate's health and well-being." *Harris v. Ashlaw*, No. 9:07-CV-0358 (LEK/DEP), 2007 WL 4324106, at *5 (N.D.N.Y. Dec. 5, 2007). Wilson has not alleged any facts suggesting that the meals posed a danger to his health or well-being. Thus, to the extent he is alleging an Eighth Amendment claim based on unsanitary meals, the court will dismiss this claim on initial review.

4.      **Mental Health**

Wilson has alleged that he attempted, but was unable, to obtain mental health treatment while in administrative detention. (ECF No. 1 at ¶ 34).

The Eighth Amendment prohibits "deliberate indifference to serious medical needs of prisoners," whether "manifested by prison doctors in response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble,* 429 U.S. 97, 104–105 (1976) (cleaned up). However, "not every lapse in medical care is a constitutional wrong." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). To succeed on a medical deliberate indifference claim, an inmate must also demonstrate both an objective and subjective element.

To meet the objective element, an inmate must allege that the conditions to which he was subjected "pose an unreasonable risk of serious damage to his health" and that the alleged deprivation of adequate medical care was "sufficiently serious." *Walker*, 717 F.3d at 125; *Salahuddin*, 467 F.3d at 279. To meet the subjective element, an inmate must allege that the defendant prison officials possessed culpable intent—that is, subjective recklessness. *See Salahuddin*, 467 F.3d at 280. To be subjectively reckless, the defendant prison official must have known of and disregarded "an excessive risk" to the inmate's health or safety. *See id.*; *Farmer*, 511 U.S. at 834, 837. That is, the defendant must be actually "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837; *see also Salahuddin*, 467 F.3d at 281 (noting that the "charged official must be subjectively aware that his conduct creates" a substantial risk of serious harm).

"It is well settled in this Circuit that 'personal involvement of defendants in alleged

17

constitutional deprivations is a prerequisite to an award of damages under § 1983.'" *Wright,* 21

F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir.

1991)). The Second Circuit has defined "personal involvement" to mean direct participation,

such as "personal participation by one who has knowledge of the facts that rendered the conduct

illegal," or indirect participation, such as "ordering or helping others to do the unlawful

acts." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (footnote omitted).

Wilson's Eighth Amendment claims fail because he has not alleged any facts to raise an

inference that any named defendant was personally involved in the failure to provide him with

mental health care during his administrative detention. Accordingly, Wilson has not asserted an

Eighth Amendment mental health deliberate indifference claim against any defendant in this

action.

> ## D.        Fourteenth Amendment Procedural Due Process

Plaintiff's complaint suggests violations of the Fourteenth Amendment due process

clause. "[T]he Due Process Clause provides that certain substantive rights—life, liberty, and

property—cannot be deprived except pursuant to constitutionally adequate procedures."

*Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541 (1985). Procedural due process analysis

"proceeds in two steps: [a court] first ask[s] whether there exists a liberty or property interest of

which a person has been deprived, and if so ... whether the procedures followed by the State

were constitutionally sufficient." *Swarthout v. Cooke,* 562 U.S. 216, 219 (2011) (per curiam).

Liberty interests may arise from either the Due Process Clause itself or "from an

expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221

(2005). In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court recognized that "States

may under certain circumstances create liberty interests which are protected by the Due Process Clause." *Id.* at 483-84. Wilson has a protected liberty interest only if the state created such an interest in a statute or regulation and the deprivation of that interest caused him to suffer an atypical and significant hardship. *See Tellier v. Fields,* 280 F.3d 69, 80-81 (2d Cir. 2000). In the prison context, a prisoner must show that he was subjected to an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. 472, 484 (1995) (prisoner subjected to a disciplinary term of thirty days confinement in restrictive housing did not sustain a deprivation of a liberty interest for purposes due process).[6] The court must examine the actual punishment received, as well as the conditions and duration of the punishment. *See Davis v. Barrett*, 576 F.3d 129, 133–34 (2d Cir. 2009); *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). "The inquiry into the severity of confinement assesses whether differences in conditions between a restrictive housing status and the general population or other restrictive statuses constitute a significant hardship." *Taylor v. Rodriguez*, 238 F.3d 188, 195 (2d Cir. 2001).

With respect to time limits for disciplinary confinement, *Sandin* held that a prisoner who was subjected to a disciplinary term of thirty days of confinement in restrictive housing did not sustain a deprivation of a liberty interest in violation of the Fourteenth Amendment's Due Process Clause. 515 U.S. at 486. Such confinement did not give rise to a liberty interest due to an atypical and significant hardship because "[t]he regime to which [the prisoner] was subjected ... was within the range of confinement to be normally expected for one serving an indeterminate term of 30 years to life." *Id.* at 487.

---

[6] *Sandin* applies to circumstances involving both administrative and disciplinary segregation. *Arce v. Walker*, 139 F.3d 329, 335 (2d Cir. 1998).

"[T]he duration of [segregated] confinement is a distinct factor bearing on atypicality and must be carefully considered." *Colon v. Howard,* 215 F.3d 227, 231 (2d Cir. 2000). There is no "bright line rule that a certain period of [segregated] confinement automatically fails to implicate due process rights." *Palmer,* 364 F.3d at 64. Generally, a long period of segregation—such as more than 305 days—"is sufficiently atypical to trigger due process protections." *Ellerbe v. Jasion*, 2015 WL 1064739, at \*5 (D. Conn. Mar. 11, 2015). "Where the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer*, 364 F.3d at 64–65 (cleaned up). Accordingly, "restrictive confinements of less than 101 days do not generally raise a liberty interest warranting due process protection, and thus require proof of conditions more onerous than usual." *Davis,* 576 F.3d at 133; *Kalwasinski v. Morse*, 201 F.3d 103, 107–08 (2d Cir. 1999) (discussing factors relevant to deciding if confinement in SHU constitutes an atypical hardship).

    1.    <u>Administrative Detention</u>

Wilson's allegations reflect that he was confined in administrative detention at Northern for at least forty days from April 3, 2020 to May 13, 2020 (the date he was found guilty on the disciplinary charges). (ECF No. 1 at ¶¶ 29, 30, 36). At the initial review stage, Wilson's allegations raise at least an inference of a liberty interest based on his isolated confinement (although of short duration) in administrative detention as he has alleged that he was confined in a cramped cell with another inmate and placed in shackles without any ability to see mental health professionals despite his mental health issues. *Id.* at ¶¶ 34, 42.

Thus, the court must next consider whether Wilson has plausibly alleged that he was denied any process he was due for his initial placement in administrative detention.

For an administrative proceeding, the inmate is entitled only to "some notice of the charges against him and an opportunity to present his views [either orally or in writing] to the prison official charged with deciding" the matter. *Hewitt v. Helms*, 459 U.S. 460, 476 (1983). These procedural steps "must occur within a reasonable time following an inmate's transfer." *Taylor v. Comm'r of New York City Dep't of Corr.*, 317 F. App'x 80, 82 (2d Cir. 2009) (quoting *Hewitt v. Helms*, 459 U.S. 460, 476 & n.8 (1983). In *Wilkinson v. Austin*, 545 U.S. 209, 229 (2005), the Supreme Court applied the standard set forth in *Hewitt* to a due process claim asserted by inmates who had been classified for indefinite placement in a high security state prison for safety and security, rather than disciplinary reasons.

By contrast, for a disciplinary hearing, an inmate is entitled to the procedural protections of advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-67 (1974). Further, "due process requires that there be some evidence to support the findings made in [a] disciplinary hearing." *Zavaro v. Coughlin*, 970 F.2d 1148, 1152 (2d Cir. 1992) (internal quotation marks omitted). This standard, however, "is extremely tolerant" and can be satisfied based on "*any* evidence in the record" supportive of the disciplinary ruling. *Girard v. Chuttey*, 826 F. App'x. 41, 46 (2d Cir. 2020) (summary order) (citing *Sira*, 380 F.3d at 69).

Wilson's allegations indicate that he was placed in the administrative detention on April 3, 2020 and received notice of the disciplinary charges against him on April 5, 2020. (ECF No. 1 at ¶ 30). Although his allegations on this point are spare, the complaint suggests that Wilson did not have an opportunity to present his views within a reasonable time as required by *Hewitt*. (ECF No. 1 para. 36 (alleging hearing occurred forty days after transfer). The court will permit his due process claim for damages to proceed beyond initial review for further development against Warden Caron, Director Maiga, Lieutenant Oulette, Correction Officer Canales, Correction Officer Ramirez, Correction Officer Leone, Correction Officer LaPrey, and Lieutenant Grimaldi, who are all alleged to have involvement with his detention prior to his disciplinary hearing.

      b.    <u>Disciplinary Hearing</u>

Wilson has failed to allege that he received any punitive sanctions as a result of the guilty finding after a disciplinary hearing. *Id.* at ¶ 36. Accordingly, Wilson has not raised an inference that he was subjected to a loss of a liberty interest due to any atypical and significant condition of confinement as a result of a lack of due process in connection with his disciplinary hearing. The court will dismiss this due process claim as not plausible.

      2.    <u>Administrative Segregation Program</u>

Wilson's complaint indicates that his placement for Administrative Segregation was approved on May 26, 2020, and that he was confined at the Northern Administrative Segregation for September 22, 2020. Wilson's alleged Administrative Segregation at Northern was of a duration of at least 119 days. Further, even after being transferred to Garner, he remained in Administrative Segregation.   ECF No. 1 para. 41.   Thus, assuming that Wilson's status has not

changed, the court notes that he has allegedly been in Administrative Segregation more than 200 days, and his placement appears to be of indefinite duration and will soon reach more than 300 days. (ECF No. 1 at ¶ 41). This court has previously held that such periods of segregated confinement "would ordinarily preclude dismissing a claim without fact-finding." *See Shand v. Parsons*, No. 3:20-CV-28 (CSH), 2020 WL 1989151, at *5 (D. Conn. Apr. 27, 2020). Thus, the court will assume for purposes of this review that Wilson "can satisfy the *Sandin* requirement of a deprivation of a liberty interest imposing an atypical and significant hardship, although further development of facts is still necessary. The court considers next whether there is any suggestion of a procedural due process violation.

Wilson has alleged that Director Maiga decided not to follow Hearing Officer Tugie's recommendation against Wilson's Administrative Segregation placement based on a letter about Wilson from Warden Caron dated April 7, 2020 (prior the reversal of his disciplinary guilty finding).

Under both the *Wolff* and *Hewitt* standards, the decisions to place an inmate in administrative or punitive segregation must be based on "some evidence." *Brown v. Semple*, No. 3:16CV376(MPS), 2018 WL 4308564, at *12 (D. Conn. Sept. 10, 2018) (*citing Superintendent v. Hill,* 472 U.S. 445, 454(1985) (procedural due process requires that decision in connection with prison disciplinary hearing be "supported by some evidence in the record"). Construed broadly, Wilson's allegations raise an inference that the letter from Warden Caron that was allegedly the basis of Maiga's Administrative Segregation decision may not constitute "some evidence" to support Wilson's Administrative Segregation placement – especially because it has allegedly not been disclosed to him and, according to his allegations, may not exist. Thus, the

court construes Wilson's allegations liberally to raise an inference that Wilson's placement in Administrative Segregation was not in compliance with procedural due process. The court will permit this claim to proceed for damages against Director Maiga and Warden Caron.

###### E.    Loss of Property

Wilson alleges violation of his Fifth and Fourteenth Amendment rights as a result of the loss of his property. (ECF No. 1 at ¶¶ 1, 40). However, the Fourteenth Amendment applies to Wilson's allegations of due process violations because this action is against only state employees. The Fifth Amendment applies to the federal government, not to the states. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002); *Ambrose v. City of New York*, 623 F. Supp. 2d 454, 466-67 (S.D.N.Y. 2009). Since Wilson is not suing any federal government officials in this case, the court must dismiss any claims brought under the Fifth Amendment.

The Due Process Clause of the Fourteenth Amendment protects the plaintiff against the denial of a protected property interest without due process of law. *Ramos v. Malloy*, No. 3:18-CV-615 (VAB), 2018 WL 1936144, at *3 (D. Conn. Apr. 24, 2018). A prisoner can state a due process claim for loss of property if the state has not created adequate post-deprivation remedies. *See Edwards v. Erfe*, 588 Fed. App'x. 79, 80 (2d. Cir. 2015); *Hudson v. Palmer*, 468 U.S. 517, 533 (1984). "The existence of state remedies, therefore, determines whether a Fourteenth Amendment claim for deprivation of property without due process is cognizable in federal court." *Conquistador v. Hannah*, 2019 WL 4346346, at *4 (D. Conn. Sept. 12, 2019)

Here, the State of Connecticut provides a remedy for lost or destroyed property. Under Connecticut General Statutes § 4-141, *et seq.*, a prisoner may bring a claim in the Connecticut Claims Commission, unless there is another administrative remedy for his claim. *See* Conn. Gen.

Stat. § 4-142. Additionally, the Department of Correction has established an administrative remedy procedure relevant to an inmate's lost or destroyed property. *Ramos*, No. 3:18-CV-615 (VAB), 2018 WL 1936144, at *3 (citing Administrative Directive 9.6(16)(B)). Wilson must seek relief for a deprivation of his property though these adequate post-deprivation remedies rather than the court. *Id.* This claim will be dismissed.

### F.    Violation of the Administrative Directives

To the extent Wilson seeks to premise a Section 1983 claim on correctional staff violations of DOC Administrative Directives, such claims are not plausible under section 1983. A defendant's failure to comply with prison regulations or administrative directives does not constitute a basis for relief under Section 1983 because "a prison official's violation of a prison regulation or policy does not establish that the official has violated the Constitution or is liable to a prisoner under 42 U.S.C. § 1983." *Fine v. UConn Med.*, No. 3:18-CV-530 (JAM), 2019 WL 236726, at *9 (D. Conn. Jan. 16, 2019) (citation omitted). Such claims must be dismissed.

### G.    Official Capacity Claims

Wilson requests a declaratory judgment and three injunctive orders. (ECF No. 1 at ¶¶ 47-50).

As a preliminary matter, any claims for money damages against the defendants, who are state employees, in their official capacities are barred by the Eleventh Amendment. *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

In *Ex parte Young*, 209 U.S. 123 (1908), the United States Supreme Court recognized a limited exception to the Eleventh Amendment's grant of sovereign immunity from suit to permit a plaintiff to sue a state official acting in an official capacity for prospective injunctive relief for

continuing violations of federal law. *Id.* at 155–56; *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371 (2d Cir. 2005). "A plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for 'prospective injunctive relief' from violations of federal law." *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007).

With respect to his claims for injunctive relief, "[i]n the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997) (citing *Farmer*, 511 U.S. at 846-47) (other citations omitted). Federal courts can order prospective relief "in any civil action with respect to prison conditions," provided it "extend[s] no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a). Injunctive relief afforded by a court must be narrowly tailored or proportional to the scope of the violation and extend no further than necessary to remedy the violation. *Brown v. Plata*, 563 U.S. 493, 531 (2011). Thus, the court should reject "remedial orders that unnecessarily reach out to improve prison conditions other than those that violate the Constitution." *Id.*

Wilson first seeks an order for Interim Commissioner Quiros, Deputy Commissioner Cepelak, District Administrator Mulligan and Director Maiga to create a more comprehensive panel to oversee the disciplinary process and grievance procedure and to provide a panel of impartial individuals to oversee Administrative Segregation placement, including one mental health professional (ECF No. 1 at ¶ 48). But Wilson has no plausible Fourteenth Amendment claim based on his disciplinary hearing or violation of the grievance procedure.

Because Wilson is allegedly still in Administrative Segregation, however, the Court will permit his request for injunctive relief concerning his Administrative Segregation placement to proceed beyond initial review against Interim Commissioner Quiros, Deputy Commissioner Cepelak, District Administrator Mulligan, and Director Maiga.

In his second request, he seeks an order to have Lieutenant Oulette, Correction Officer Canales and Ramirez take religious sensitivity training and for Lieutenant Oulette to be removed from the Intelligence Unit. This request is not plausible because Wilson does not have an ongoing First Amendment claim based on his religious freedom. Further, he is no longer housed at Carl Robinson and "[a] prisoner's transfer to a different correctional facility generally moots his request for injunctive relief against employees of the transferor facility." *Thompson v. Carter,* 284 F.3d 411, 415 (2d Cir. 2002).

In his third request, Wilson seeks an order for defendants to remove him from Administrative Segregation and to restore all property. The court will permit this claim to proceed beyond initial review to the extent he seeks removal from Administrative Segregation. However, the claim regarding his property will be dismissed because it does not present relief for an ongoing constitutional violation.

Wilson requests a declaration that defendants have violated his constitutional rights. Declaratory relief operates in a prospective manner to allow parties to resolve claims before either side suffers significant harm. *See In re Combustion Equip. Assoc. Inc.,* 838 F.2d 35, 37 (2d Cir. 1988). However, a declaratory judgment concerns prospective relief that is only available if a plaintiff can show "a sufficient likelihood" of being wronged again "in a similar way." *Macavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012). The Supreme Court has

27

provided that "notice relief" is not the type of remedy designed to prevent ongoing violations of federal law and is also thereby barred by the Eleventh Amendment. *Green v. Mansour*, 474 U.S. 64, 71 (1985); *see also In re Deposit Ins. Agency*, 482 F.3d 612, 617(2d Cir. 2007). Thus, Wilson's request for a declaratory judgment that defendants have violated his constitutional rights must be dismissed.

### H.     Security Lien

Wilson requests "a security lien placed upon the assets and/or properties of each [of the] defendants to ensure compensatory and punitive relief" pursuant to Connecticut General Statutes § 52-278(a)(b). (ECF No. 1 at ¶ 54). The court construes Wilson's complaint as requesting a prejudgment remedy. However, such a remedy is available only if a plaintiff shows probable cause to conclude that judgment will be rendered in his favor. *See Roberts v. TriPlanet Partners, LLC*, 950 F. Supp. 2d 418, 420 (D. Conn. 2013) (quoting Conn. Gen. Stat. § 52-278d(a)). Although Wilson has alleged certain claims that give rise to plausible grounds for relief, his complaint's allegations fall short of establishing probable cause to conclude that his claims will succeed. Accordingly, the court will deny without prejudice his request for a security lien absent a more substantial showing of his likelihood of success.

## ORDERS

The Court enters the following orders:

(1) The case shall proceed on Wilson's First Amendment retaliation claim against Warden Caron, Correction Officer John Doe, Lieutenant Oulette, Correction Officer Canales, Correction Officer Leone, Correction Officer Ramirez, DHO Lieutenant Grimaldi, Correction Officer LaPrey, and Director Maiga in their individual capacities; on his Eighth Amendment conditions

28

of confinement claim against Warden Caron in her individual capacity; on his Fourteenth Amendment due process claims against Warden Caron, Director Maiga, Lieutenant Oulette, Correction Officer Canales, Correction Officer Ramirez, Correction Officer Leone, Correction Officer LaPrey, and Lieutenant Grimaldi in their individual capacities; and on his Fourteenth Amendment due process requests for injunctive relief against Interim Commissioner Quiros, Deputy Commissioner Cepelak, District Administrator Mulligan, and Director Maiga in their official capacities. All other federal claim are DISMISSED without prejudice.

Wilson may file, **within 30 days of this Order**, an amended complaint if he believes that he can correct the deficiencies with his claims identified in this order. The court advises Wilson that any amended complaint will completely replace the prior complaint in this action and that no portion of any prior complaints shall be incorporated into his amended complaint by reference.

(2) The clerk shall verify the current work addresses for Warden Caron, Lieutenant Oulette, Correction Officer Canales, Correction Officer Leone, Correction Officer Ramirez, DHO Lieutenant Grimaldi, Correction Officer Cieboter, Correction Officer LaPrey, and Director Maiga with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the initial review order, this order, and the complaint to them at their confirmed addresses within **twenty-one (21) days** of this Order, and report on the status of the waiver request on the **thirty-fifth (35th) day** after mailing. If any defendant fails to return the waiver request, the clerk shall make arrangements for in-person individual capacity service by the U.S. Marshals Service on that defendant, and that defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(3) T**he Clerk shall** prepare a summons form and send an official capacity service

packet to the U.S. Marshal Service. The U.S. Marshal Service is directed to effect service of the Complaint and this Order on Interim Commissioner Angel Quiros, Deputy Commissioner Cepelak, District Administrator Mulligan, and Director Maiga in their official capacity at the Office of the Attorney General, 165 Capitol Avenue, Hartford, CT 06106, within **twenty-one (21) days** from the date of this order and to file a return of service within thirty (30) days from the date of this order.

(4) Because the Clerk cannot effect service on the Doe Defendant without that defendant's full name and current address, Wilson must obtain this information and file a Notice of Identification that identifies the Doe Defendant **within 45 days of this Order's filing date.** Wilson is directed to obtain this information during discovery and to file a notice containing the information with the court. **Once the Doe defendant has been identified, the court will order that he or she be served with a copy of the complaint. Failure to identify the Doe defendant will result in the dismissal of all claims against that defendant.**

(5) The clerk shall mail a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs.

(6) The defendants shall file their response to the complaint, either an answer or motion to dismiss, **within sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them. If the defendants choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. The defendants may also include any and all additional defenses permitted by the Federal Rules.

(7) Discovery, according to Federal Rules of Civil Procedure 26-37, shall be completed within **six months (180 days)** from the date of this Order. Discovery requests need not be filed

with the Court.

(8) The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures," which will be sent to both parties by the Court. The Order can also be found at http://ctd.uscourts.gov/administrative-standing-orders.

(9) All motions for summary judgment shall be filed within **seven months (210 days)** from the date of this Order.

(10) According to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within **twenty-one (21) days** of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(11)  If the plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the Court. Failure to do so can result in the dismissal of the case. The plaintiff must give notice of a new address even if he is incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If the plaintiff has more than one pending case, he should indicate all of the case numbers in the notification of change of address. He should also notify the defendants or defense counsel of his new address.

(12) The plaintiff shall utilize the Prisoner Efiling Program when filing documents with the court. The plaintiff is advised that the Program may be used only to file documents with the court. Local court rules provide that discovery requests are not filed with the court. D. Conn. L. Civ. R. 5(f). Therefore, discovery requests must be served on defendants' counsel by regular mail.

_____/s/_____
Michael P. Shea
United States District Judge

**SO ORDERED** this 16th day of December 2020, at Hartford, Connecticut.